# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| JOSEPH HUERTA, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:19-cv-00213 |
| | § | |
| PHILLIPS 66 COMPANY | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT PHILLIPS 66 COMPANY'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Dated: December 14, 2020

Respectfully submitted,

<u>*/s/ Shauna Johnson Clark*  </u>
Shauna Johnson Clark
State Bar No. 00790977
Fed. Id. No. 18235
shauna.clark@nortonrosefulbright.com

OF COUNSEL:
Heather Sherrod
State Bar No. 24083836
Federal I.D. No. 1734213
heather.sherrod@nortonrosefulbright.com
Carolyn Webb
State Bar No. 24106558
Fed I.D. No. 3150994
carolyn.webb@nortonrosefulbright.com

Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

***Attorney-in-Charge for Defendant Phillips 66 Company***

**Norton Rose Fulbright US LLP**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS .......................................................... 2

    I.     Huerta's Employment at Phillips 66 ......................................... 2

    II.    Phillips 66's Employees are Expected to Act with Integrity and be Truthful ................................................................................. 3

    III.   Employees are Expected to Participate in Company Investigations and Provide Information Upon Request ........................................ 4

    IV.   Huerta Receives a Final Written Warning for Failing to Complete Training and Certification for Additional Jobs ............................. 4

    V.    Huerta Calls in Sick Under Suspicious Circumstances and Phillips 66 Launches an Investigation ..................................................... 6

         A.   After He is Told to Report to the Console Board for His Next Shift,  Huerta Calls in Sick for a Week ................................. 6

         B.   The Refinery Uses Private Investigators as an External Resource When Investigating Leave Fraud ......................... 8

         C.   A Private Investigator Observes Huerta Working on a Roof and Coaching a Baseball Game When he Would Otherwise be at Work ............................................................................. 8

    VI.   Phillips 66 Terminates Huerta for Job Abandonment ................. 11

    VII.  Huerta Files This Lawsuit ....................................................... 14

STANDARD OF REVIEW .................................................................................. 16

ARGUMENTS & AUTHORITIES ...................................................................... 16

    I.     Huerta's Age, National Origin, and Disability Disparate Treatment Discrimination Claims Fail As a Matter of Law .......................... 16

         A.   Huerta's Allegations Related to His Written Warnings are Time Barred ................................................................. 17

         B.   On His Remaining Termination Claim, Huerta Cannot Establish the Fourth Element of His Prima Facie Cases ................. 17

         C.   Huerta Has No Evidence of Pretext ................................. 21

    II.    Huerta's FMLA Claims Fail as a Matter of Law ........................ 25

         A.   Huerta Has No Evidence to Support an FMLA Retaliation Claim ......................................................................... 25

         B.   FMLA Harassment Is Not a Cause of Action ................... 27

III.    Huerta's ADA Failure to Accommodate Claim Fails as a Matter of
        Law ............................................................................................................ 28

CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. CSX Transp., Inc.*,
No. 3:06-cv-704, 2010 WL 6792993 (M.D. Fla. Dec. 20, 2010) ................................. 31

*Armstrong v. Indiana State Bd. of Accounts*,
No. 303-CV174, 2005 WL 2656742 (S.D. Ind. Oct. 18, 2005)................................... 32

*Bouie v. Equistar Chems., LP*,
188 F. App'x 233 (5th Cir. 2006) ................................................................ 26

*Bryant v. Compass Grp. USA*,
413 F.3d 471 (5th Cir. 2007) ...................................................................... 28

*Burch v. City of Nacogdoches*,
174 F.3d 615 (5th Cir. 1999) ...................................................................... 26

*Callison v. City of Philadelphia*,
430 F.3d 117 (3d Cir. 2005)........................................................................ 30

*Carbaugh v. Unisoft Int'l, Inc.*,
No. 10-0670, 2011 WL 5553724 (S.D. Tex. Nov. 15, 2011) ..................................... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................... 22

*Clark v. Champion Nat'l Sec., Inc.*,
952 F.3d 570 (5th Cir. 2020) ...................................................................... 34

*Connel v. Hallmark Cards, Inc.*,
No. 01-2060, 2002 WL 188467 (D. Kan. Feb. 1, 2002)........................................... 30

*Cook v. E. Tex. State Univ.*,
142 F.3d 1279 (5th Cir. 1998) .................................................................... 27

*Cook v. Stephen F. Austin Univ.*,
9:19-CV-201-RC-ZJH, 2020 WL 6553963 (E.D. Tex. Oct. 21, 2020)...................... 33

*Daigle v. Liberty Life Ins. Co.*,
70 F.3d 394 (5th Cir. 1995) ...................................................................... 23

*Dodge v. Hertz Corp.*,
124 F. App'x 242 (5th Cir. 2005) ................................................................ 26

*Dortch v. Mem'l Herman Healthcare Sys.*,
525 F. Supp. 2d 849 (S.D. Tex. 2007) ........................................................... 32

*Feist v. La. Dep't. of Justice, Office of the Att'y. Gen.*,
730 F.3d 450 (5th Cir. 2013) ...................................................................... 33

*Flowers v. S. Reg'l Physician Servs.*,
   247 F.3d 229 (5th Cir. 2001) ................................................................ 32

*Frank v. Xerox*,
   347 F.3d 130 (5th Cir. 2003) ................................................................ 22

*Freberg v. Marquette Gen. Health Sys.*,
   No. 2:13-CV-316, 2014 WL 1028891 (W.D. Mich. Mar. 17, 2014)........... 32

*Hayatdavoudi v. Univ. of La. Sys. Bd. of Trs.*,
   240 F.3d 1073 (5th Cir. 2000) .............................................................. 23

*Hervey v. Miss. Dep't of Educ.*,
   404 F. App'x 865 (5th Cir. 2010) .......................................................... 29

*Jackson v. Cal-W. Packaging Co.*,
   602 F.3d 374 (5th Cir. 2010) ................................................................ 24

*Jenkins*, 487 F.3d at 316 ........................................................................ 34

*Jones v. Overnite Transp. Co.*,
   212 F. App'x 268 (5th Cir. 2006) .......................................................... 28

*King v. Louisiana*,
   294 F. App'x 77 (5th Cir. 2008) ............................................................ 23

*Lee v. Kan. City S. Ry. Co.*,
   574 F.3d 253 (5th Cir. 2009) .......................................................... 24, 25

*Martin v. Bayland, Inc.*,
   403 F. Supp. 2d 578 (S.D. Tex. 2005), aff'd, 181 F. App'x 422 (5th Cir.
   2006) .................................................................................................. 24

*Matthews v. Trilogy Commc'ns*,
   143 F.3d 1160 (8th Cir. 1998) .............................................................. 29

*McDonnell Douglas v. Green*,
   411 U.S. 792 (1973). ........................................................................... 23

*Mekasha v. ExxonMobil Corp.*,
   No. 3-04-CV-0797-B, 2005 WL 1215025 (N.D. Tex. May 20, 2005)....... 27

*Miedema v. Facility Concession Servs., Inc.*,
   487 F. App'x. 214 (5th Cir. 2012) ......................................................... 30

*Molden v. E. Baton Rouge Par. Sch. Bd.*,
   715 F. App'x 310 (5th Cir. 2017) .......................................................... 33

*Montgomery v. Potter*,
   2:04CV162-D-A, 2006 WL 559240 (N.D. Miss. Mar. 6, 2006) ................ 29

*Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*,
   245 F.3d 507 (5th Cir. 2001) ................................................................ 24

*Owens v. Dallas County Cmty. Coll. Dist.*,
793 F. App'x. 298 (5th Cir. 2019) (ADA and Title VII) ............................................ 22

*Palmer v. Sw. Bell Tel., L.P.*,
A-06-CA-478-SS, 2007 WL 9701631 (W.D. Tex. Mar. 15, 2007) ............................ 30

*Patton v. United Parcel Serv.*,
910 F. Supp. 1250 (S.D. Tex. 1995) ........................................................................ 28

*Player v. Kan. City S. Ry. Co.*,
496 F. App'x 479 (5th Cir. 2012) ............................................................................. 25

*Prichard v. Phillips 66 Motor Mfg. of Alabama, LLC*,
418 F. Supp. 3d 930 (M.D. Ala. 2019) .................................................................... 31

*Pryor vs. MD Anderson Cancer Ctr.*, 495 F. App'x 544 (5th Cir. 2012) ........................ 24

*Reyna v. Donley*,
479 F. App'x 609 (5th Cir. 2012) ............................................................................. 25

*Rodriguez v. Eli Lilly & Co.*,
820 F.3d 759 (5th Cir. 2016) ................................................................................... 30

*Schaeffer v. Warren Cnty.*,
2016 WL 411221 (S.D. Miss. Feb. 2, 2016) ............................................................ 29

*Scott v. DMN, Inc.*,
No. CIV.A.3:99-CV-2776-L, 2001 WL 428276 (N.D. Tex. Apr. 19,
2001) ....................................................................................................................... 27

*Smith v. Potter*,
400 Fed. App'x. 806 (5th Cir. 2010) ........................................................................ 22

*Smith-Schrenk v. Genon Energy Servs., LLC.*,
H-13-2902, 2015 WL 150727 (S.D. Tex. Jan. 12, 2015) ......................................... 32

*Spindle v. CKJ Trucking, LP*,
No. 4:18-CV-818, 2020 WL 1283519 (E.D. Tex. Mar. 18, 2020) ............................ 27

*Stevenson v. Bost*,
2011 WL 2181735 (E.D.N.C. June 3, 2011) ............................................................ 33

*Taylor v. Principal Fin. Grp.*,
93 F.3d 155 (5th Cir. 1996) ..................................................................................... 34

*Trotter v. BPB Am., Inc.*,
106 F. App'x 272 (5th Cir. 2004) ............................................................................. 26

*VRV Dev. L.P. v. Mid-Continent Cas. Co.*,
630 F.3d 451 (5th Cir. 2011) ................................................................................... 22

*Wellington v. Texas Guaranteed*,
2014 WL 2114832 (W.D. Tex. May 20, 2014) ........................................................ 33

*Williams v. Trader Publ'g Co.*,
    218 F.3d 481 (5th Cir. 2000) ............................................................ 24

*Wilson v. City of Baton Rouge*,
    327 F. App'x 497 (5th Cir. 2009) .................................................... 25

*Windhauser v. Bd. of Supervisors for La. State Univ.*,
    360 F. App'x 562 (5th Cir. 2010) .................................................... 33

**Rules and Statutes**

29 U.S.C. § 621 .................................................................................... 7

29 U.S.C. § 2601 ........................................................................ 7, 16, 30

42 U.S.C. § 2000e ................................................................................ 7

42 U.S.C. § 12101 ................................................................................ 7

42 U.S.C. § 12112(b)(5) ...................................................................... 33

221 F.3d at 1176 .................................................................................. 31

Fed. R. Civ. P. 56(c) ........................................................................ 7, 21

## <u>DEFENDANT PHILLIPS 66 COMPANY'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56, Defendant Phillips 66 Company ("Phillips 66") files this Motion for Summary Judgment.

## INTRODUCTION

In this employment discrimination lawsuit, Plaintiff Joseph Huerta alleges that Phillips 66 discriminated against him on the basis of his national origin, age, and disability in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621; and the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.*

Huerta also alleges that Phillips 66 retaliated against him in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Although not specifically pled, Huerta also appears to assert hostile work environment claims under Title VII, the ADEA, the ADA, and the FMLA. The crux of all of Huerta's claims is that Phillips 66 discriminated and retaliated against him when it terminated his employment for job abandonment. Phillips 66 denies Huerta's allegations in their entirety.

Phillips 66 is entitled to summary judgment because Huerta does not have probative evidence to establish a genuine issue of material fact on any of his claims. On the contrary, the undisputed evidence in this case shows that Huerta was terminated for legitimate, non-discriminatory and non-retaliatory reasons; namely, Phillips 66 terminated Huerta for job abandonment after the Company learned that he was engaged in activities that were inconsistent with his purported medical condition and for a month

tried to contact him by phone and mail to request documentation and information to support his medical leave. Because Huerta refused to provide the information requested, he was terminated. Huerta has no evidence that Phillips 66's well-supported reasons for terminating his employment were a pretext for discrimination or retaliation.

The crux of Huerta's case is that he believes Phillips 66 should have accepted his doctor's conclusion that he should remain off of work for two months to treat his diabetes—a condition that is manageable with better diet and medication—even though he cannot explain why he could perform the strenuous activities he was observed performing outside of work, including working on a roof and coaching Little League, but not report to work. This is simply not what the law requires. Accordingly, as more fully set forth below, summary judgment in favor of Phillips 66 is appropriate.

## STATEMENT OF UNDISPUTED FACTS

### I.    Huerta's Employment at Phillips 66

Headquartered in Houston, Texas, Phillips 66 is an advantaged downstream company, with segment-leading refining and marketing, midstream and chemicals businesses with 13500 employees worldwide. Declaration of Krystle King at ¶4, attached as Exhibit A. Phillips 66 centers its business on responsibly delivering petroleum products to the world. *Id.* at ¶4.

Philips 66 hired Huerta to work at the Company's Sweeny Refinery in June 1990. Deposition of J. Huerta at 20:1-5, attached as Exhibit B; King Dec. at ¶5. The Refinery operates on a 12-hour rotating shift schedule, often referred to as the "DuPonte Schedule." King Dec. at ¶5; Huerta Dep. at 38:2-10. Huerta worked as an Operator at the

Sweeney Refinery for the entirety of his employment. Huerta Dep. at 27:11-14.

As an Operator, Huerta was responsible for ensuring the refinery equipment in his assigned unit was maintained properly within its safe operating limits to ensure there were no incidents which could lead to a fire, explosion, or release of hydrocarbons or other chemicals. Declaration of Jeff Farley at ¶4, attached as Exhibit C. For the last several years of his employment, Huerta was assigned to Unit 27, also referred to as the CAT Cracker Unit, reporting to Jeff Farley, Shift Supervisor. *Id.* at ¶4; Huerta Dep. at 36:6-9, 25-37:1.

## II.     Phillips 66's Employees are Expected to Act with Integrity and be Truthful

Phillips 66 is committed to upholding the highest ethical standards in its operations, and expects its employees to make the right decisions and remain true to the Company's core principles. King Dec. at ¶6. Phillips 66 maintains various policies and procedures to support these standards, including the Company's equal employment opportunity policy which prohibits any form of discrimination, harassment, or retaliation, and its Code of Business Ethics and Conduct (the "Code of Conduct"). *Id.*; Ex. A-1; Ex. A-2. To promote honest and ethical behavior, Phillips 66's Code of Conduct stresses that employees are expected to stand behind their word. *Id.*; Ex. A-2 at 1. To underscore the importance of the Code of Conduct, Phillips 66 requires employees to certify annually that they understood and were in compliance with the Code of Conduct. *Id.*

Phillips 66's Sweeney Refinery's Basic Rules of Conduct, posted throughout the refinery, further reiterate the company's commitment to honest and transparent behavior by prohibiting employees from misrepresenting or falsifying facts. Ex. A-3, Huerta Dep.

at 27:18-27, 28:17-19.

## III.   Employees are Expected to Participate in Company Investigations and Provide Information Upon Request

To ensure its policies are followed, Phillips 66 maintains robust reporting procedures and anti-retaliation policies. King Dec. at ¶7; *see also* Huerta Dep. at 25:12-19. Phillips 66 encourages employees to report any concerns to management or Human Resources. King Dec. at ¶7. The Company offers employees several avenues to lodge complaints, including a confidential and anonymous 1-800 ethics hotline and website. *Id.*

Phillips 66 promptly investigates all complaints and takes appropriate remedial or disciplinary action if necessary. *Id.* at ¶7. Huerta understood that if the Company conducts an investigation into a possible violation of the Code of Conduct or other policies, that it was his responsibility to assist and provide any information he was asked to provide in connection with the investigation. Huerta Dep. at 24:14-25:5.

## IV.   Huerta Receives a Final Written Warning for Failing to Complete Training and Certification for Additional Jobs

Huerta received a written warning in March 2018 for failing to receive a job certification on the Sweeney Refinery expander by his agreed deadline. Huerta Dep. at 61:17-62:9; Ex. C-2. Before an Operator can be assigned to a particular job line, the Operator must undergo training and certification. *Id.* at 42:24-44:4. There are five separate job lines for which a Unit 27 Operator can certify—27.1 console; 27.2 outside; 27.2 console; expander; and fractionator. *Id.* at 42:6-23; Deposition of Jeff Farley at 36:17-21, attached as Exhibit D. Operators assigned to Unit 27 who complete all five certifications are promoted to Operator One (also referred to as Lead Operator) and

receive a pay raise. *See* Farley Dep. at 39:17-20.

Even though Huerta had worked as an Operator at the refinery for twenty-seven years, he had failed to complete two of the five certifications in his assigned unit.[1]  As a result, Huerta and Farley agreed to a training and development plan so that Huerta could first become certified on the expander. Huerta Dep. 58:16-22, 59:4-15; Ex. C-3. As stated in the Individual Training and Development Plan Huerta signed on August 2, 2017, Operators are generally expected to complete outside certifications within three months while performing their other job duties. Ex. C-3. As a result, Huerta agreed to become certified by November 3, 2017. *Id.* at 60:19-20; Ex. C-3. He failed to meet the deadline. Farley Dec. at ¶5.

Huerta acknowledges the trainings are self-guided. *Id.* at 43:14-44:8. He was aware it was his responsibility to review the training materials. *Id.* After reviewing the training materials, it was his responsibility to practice the new job during his shifts while also performing the job tasks he was already certified to perform. *Id.* He acknowledged that Operators already certified on the 27.1 console and 27 expander were available during his shift to walk through any questions he had. *Id.* Patrick Buentello, Shift Leader, was also available to answer any questions he had while training. *Id.* at 44:9-13. To become certified on a new job line, Huerta was required to show he has learned the equipment and duties of the new role by passing computer-based written tests. *Id.* at 44:14-20. Once certified, his supervisor could assign him to work shifts covering the new

---

[1] On June 12, 2014, Huerta was required to recertify for two of the certifications he already possessed, 27.2 outside and 27.2 console, following an "upset" at the refinery.  Huerta Dep. at 45:1-17, 49:7-51:19.

job line. *Id.* at 44:18-23.

Even though Huerta failed to meet the deadline for his training, Farley continued to provide Huerta with additional time to complete the certifications. Farley Dec. at ¶6. In March 2018, Huerta still had four exams left to take to become certified on the expander, including a cumulative final exam, and would also need to compete a field proficiency demonstration evaluation. *Id.* at ¶6; Ex. C-4. As a result of his failure to timely complete the expander certification, and continued lack of diligence in pursuing the self-guided training, Farley recommended Huerta be disciplined. *Id.* at ¶6. Human Resources reviewed and approved the decision. King Dec. at ¶8. Because Huerta had previously received a written warning for sleeping on the job,[2] as the next step in the Company's disciplinary process, Huerta receive a final written warning and two-day suspension without pay. Huerta Dep. at 64:8-11.

## V. Huerta Calls in Sick Under Suspicious Circumstances and Phillips 66 Launches an Investigation

### A. After He is Told to Report to the Console Board for His Next Shift, Huerta Calls in Sick for a Week

Two months later, in May 2018, Huerta was still training to receive his

---

[2] In April 2016, Huerta received a written warning for sleeping on the job while assigned to work the Unit 27.2 console. Huerta Dep. at 179:20-180:13. Farley approached Huerta in the Centralized Control Building Console Room from the side and observed that Huerta had his feet on the desk and his eyes were closed. Farley Dec. at ¶9. Based on his observation, Huerta was asleep. *Id.* Farley then shook Huerta on the arm, which caused Huerta to open his eyes. *Id.* Farley instructed Huerta to wake up. *Id.* Operators assigned to work the refinery console boards are responsible for monitoring and controlling process variables to ensure the safe, environmentally sound, and economic operation of the unit. *Id.* at ¶10. It is critically important that Operators remain alert at all times and not sleep while on duty. *Id.* As a result of Huerta's violation of this critical safety rule, Huerta received a written warning on April 22, 2016. *Id.*; Ex. C-1.

certification on the expander. Farley Dep. at 30:7-25. Typically, Huerta rotated shifts performing "outside" job lines for which he was certified and "inside" jobs at the console. Because the expander is an "outside" job, to train on the expander during his shifts, Farley and Buentello had to continuously assign Huerta to another "outside" job line for which he was already certified. *Id.*; Farley Dec. at ¶7. In other words, Huerta could not work at the 27.2 console and train for the expander job at the same time. *Id.* As a result, another Operator, Jesse Austin, was required to spend every shift performing the 27.2 console duties while Huerta spent months training outside for his expander certification. *Id.*

On May 7, 2018, Buentello informed Farley that Austin had asked for a break from working the console. *Id.* at ¶8; Farley Dep. at 30:20-31:13. Farley instructed Buentello to grant Austin's request and inform Huerta to report to the console for his shift the following day. *Id.* Even though Huerta worked his full shift on May 7, 2018 without issue, Huerta called the Unit 27 supervisor on duty a few hours later to report that he was sick and would not be at work the next day, May 8, 2018, or for the remainder of his shifts that week. *Id.* Buentello notified Farley and explained that Huerta seemed unhappy when Buentello told him that morning that he would need to report to the console for his next shift. *Id.* Buentello told Farley he believed Huerta had falsified the reason for his absences because he did not want to work at the 27.2 console. *Id.* In response, Farley contacted Krystle King, Human Resources Business Partner, to relay his concerns and ask if Human Resources could retain an external investigator to determine the legitimacy of Huerta's absence. *Id.*; *see also* King Dep. at 56:13-57-1. Michael Saiz, Sweeny

Refinery Human Resources Manager, approved the request. King Dec. at ¶9; Ex. A-4; Deposition of Michael Saiz at 25:14-26:2.

### B.   The Refinery Uses Private Investigators as an External Resource When Investigating Leave Fraud

The Sweeny Refinery Human Resources Department had used a private investigator as an external resource to investigate potentially falsified medical leaves of absence on other occasions—regardless of the employees' races, ages, or disability status. King Dec. at ¶10. For example, the Human Resources Department approved a private investigator to determine whether another Operator at the Sweeney Refinery  had engaged in absence fraud when he took off work for a purported shoulder injury. *Id.* Phillips 66 terminated the Operator after an investigator reported observing the Operator working at the Houston Rodeo and riding a horse and the Operator was unable to explain the discrepancy.  *Id.* Likewise, a private investigator observed another Sweeney Refinery Operator exercising and running errands to a liquor store, after he called in sick for work under suspicious circumstances. *Id.* The Company terminated the Operator's employment for violating the Code of Conduct because the employee could not explain why he could engage in the leisure activities he was observed performing but not report to work.  *Id.* Neither of these employees were Mexican-American or suffered a disability. *Id.*

### C.   A Private Investigator Observes Huerta Working on a Roof and Coaching a Baseball Game When he Would Otherwise be at Work

It is the Standard Practice of Phillips 66's Medical Services Department for the on-site refinery nurse to contact refinery employees the day they call in sick for a shift to determine the nature and extent of their illness and when and whether they can return to

work. Declaration of R. Buentello at ¶4, attached as Exhibit E. On the morning of May 8, 2018, the Sweeney Refinery Nurse, Roseann Buentello,[3] called Huerta to discuss his sick leave. *Id.* Huerta returned her call seven hours later, explaining that he did not wish to come into work. *Id*. When Ms. Buentello pressed for his symptoms, Huerta stated his blood pressure was high. *Id.* She then asked if he had a blood pressure monitor and to provide her the reading, but he declined to respond. *Id.*  Instead, Huerta stated that his sugar levels were high when he checked the night before. *Id.* Ms. Buentello advised Huerta to come in for an evaluation, and he declined, stating he had a doctor's appointment with his physician, Dr. Liberoni, scheduled for the following afternoon. *Id.*

On the evening of May 8, 2018, the private investigator reported to Saiz that he observed and videotaped Huerta repairing the roof of a commercial building in Bay City, Texas that afternoon. Deposition of Michael Saiz at ¶4, Exhibit F; Ex. F-1. The following day, May 9, 2018, the investigator reported to Saiz that Huerta was observed having lunch, working on the roof of the same commercial building again, and then serving as the third base coach at a little league game. *Id.*; Ex. F-2. The investigator later provided a comprehensive investigation report reflecting these findings with photographs of Huerta engaged in the reported activities. *Id.*; Ex. F-3.

At his deposition, Huerta acknowledged that, despite his claim that he could not report to work because he was sick, he indeed spent more than an hour on the roof of the

---

[3] To avoid confusion, Phillips 66 refers to Roseann Buentello in this Motion as "Ms. Buentello" and Patrick Buentello as "Buentello." Ms. Buentello (Hispanic) is married to Buentello (Hispanic), Huerta's Shift Supervisor.  Deposition of Roseann Buentello at 20:7-16, attached as Exhibit G.  She has not shared medical information gathered in the course of her duties about Mr. Huerta, or any other Operator, with her husband. *Id.* at 20:17-22, 21:10-12.

commercial building he owns and rents to a commercial tenant on May 8th and May 9th. Huerta Dep. at 76:6-24. While he admits that he coaches his son's little league games, he does not believe he coached a game on the night of Wednesday, May 9, 2018, because "there are no games on Wednesdays." *Id*. at 80:12-17. Huerta also admits that during his May 9th appointment with Dr. Liberoni, he did not ask what his restrictions were and if he could work on a roof or coach baseball. *Id.* at 79:2-19.

The next day, May 10, 2018, Dr. Liberoni's office faxed an incomplete Employee Health Report ("EHR")[4] to Ms. Buentello stating that Huerta could resume work on May 16, 2018. R. Buentello Dec. at ¶5; Ex. E-1. The EHR stated the reason for Huerta's need for a leave of absence was to treat "uncontrolled diabetic nephropathy," a common complication of diabetes treatable with medication and better diet.[5] *Id.*

Huerta did not report to work on May 16th. Instead, Dr. Liberoni submitted another incomplete EHR stating that Huerta would need to be off of work for an additional two months—until July 15, 2018—due to his uncontrolled diabetes and to see a urologist. E-2. Again, the EHR did not provide a treatment plan, a list of physical

---

[4] An EHR is a medical documentation form that Phillips 66 requires employees who request a medical leave of absence to submit to their treating physician to complete and return to the Company. Buentello Dec. at ¶8. Phillips 66's Health Services Department analyzes the EHR and the Absence Management Department reviews the Health Service Department's summary of the EHR to determine whether sufficient information has been provided to determine qualification for FMLA leave and short term disability benefits, the reason for the employee's leave, how long the employee can be expected to be out, what activities the employee is capable of performing, and what restrictions, if any, the employee requires to return to work. *Id.*

[5] Dr. Liberoni diagnosed Huerta's diabetes in 2006. Huerta Dep. at 175:7-11. At that time, Dr. Liberoni prescribed medication and encouraged Huerta to cut back on what he was eating and exercise to lose weight. Id. at 175. He later prescribed insulin. Id. at 176:20-24. Huerta acknowledges his diabetes did not prevent him from performing his Operator duties from the time of his diagnosis until he took leave in 2018. *Id.* at 177:22-178:5. His diabetes did not restrict his physical activity, such as limit how long he could work, stand, or climb or otherwise prevent him from doing his job. *Id.*

limitations that prevented him from performing his duties, or the reason Huerta would need to remain off of work tor three months total to treat a common, manageable condition. *Id. See also* Huerta Dep. at 104:4-12 (agreeing no restrictions were listed on the EHR). Huerta testified that during his May 16th appointment, Dr. Liberoni informed him that he should remain off of work to see if his sugar levels would decrease, visit a urologist, and because "he could see [Huerta] was under a lot of stress too." Huerta Dep. at 102:23-103:13. The EHR does not refer to stress, and in fact, Dr. Liberoni checked the box that the absence was not due to a mental health condition. Ex. E-2.

In response, Ms. Buentello designated Huerta's absences as FMLA leave, and she, King, and Shawn Fanning, Absence Management Team Lead Advisor, continued to reach out to Huerta in an effort to gather additional information to confirm the legitimacy of his leave request.[6]  King Dec. at ¶11; R. Buentello Dep. at 23:23-24:3, 37:19-24.

## VI.     Phillips 66 Terminates Huerta for Job Abandonment After He Refuses to Provide Requested Documentation to Support His Leave of Absence and Participate in the Company's Investigation of Absence Fraud

After the private investigator informed Saiz that he had observed Huerta working on a roof of a building and coaching a Little League game—activities that were inconsistent with his purported medical condition—Phillips 66 did not immediately terminate Huerta. Instead, the Company made **nine** attempts to contact Huerta during his

---

[6] Multiple Phillips 66 policies put employees on notice that, in addition to completing an EHR, the Company may request additional information to support a medical leave of absence. For example, the Health & Wellbeing Handbook states that employees who receive short term disability benefits may be asked to submit to a second medical evaluation and that failure to complete the requested evaluation and EHRs may result in a loss of benefits and/or disciplinary action. Huerta Dep. 34:14-35:6.  The Company's FMLA policy likewise states that Phillips 66 may request a second medical evaluation and/or may request information to verify or authenticate an EHR and will request additional information if the EHR is incomplete or insufficient.  *Id.* at 31:8-25; A-4 at 4.

absence to better understand his condition, his treatment plan, his limitations, and why he could perform the strenuous activities he was observed performing but not report to work:[7]

- May 10, 2018 – Ms. Buentello called Huerta to notify him his medical documentation was deficient and to request that he visit the refinery for a medical evaluation. R. Buentello Dec. at ¶6. Huerta refused and stated he would see his personal physician. *Id.*

- May 15, 2018 – Ms. Buentello and King called Huerta and asked him again to visit the refinery for a medical evaluation. *Id.* Huerta again refuses and stated he would see Dr. Liberoni again and provide another EHR. *Id.*; King Dec. at ¶11.

- May 21, 2018 – King called Huerta and left a voicemail to return her call to discuss his absence. King Dec at ¶12. Huerta returned the call after business hours and left a message. *Id.*

- May 22, 2018 – King called Huerta again and left a voicemail to return her call to discuss his absence. *Id.* Huerta did not return the call. *Id.*

- May 25, 2018 – Phillips 66's Absence Management Department sent Huerta a letter explaining that the two EHRs he submitted did not include sufficient information to approve his request for two months of paid medical leave to treat his diabetes. The letter requested that he submit: (1) an explanation of his condition; (2) clinical exam findings supporting treatment; (3) activities limited by his condition; and (4) his ability to return to work in any capacity. E-3. Huerta did not provide the requested documentation and acknowledged his EHR did not contain the requested information  Huerta Dep. at 119:11-120:15, 136:1-4.[8]

- May 29, 2018 – Krystle King sent Huerta a letter reiterating that it was imperative he provide the documentation requested by Absence Management by June 1, 2018 or he would be terminated for job abandonment. Huerta Dep. at 132:3-7; A-6. King provided her cell phone and office phone numbers. Huerta left a voicemail

---

[7] *See* King Dep. at 38-39 ("So with the medical records not being complete, we were trying to validate whether his activities, such as being on a roof, were compliant with what we knew of his medical condition . . . our local medical office, who is responsible for managing cases such as this, they were also trying to identify specifically why he was out and what his restrictions were, and, again, we were unsuccessful due to Mr. Huerta, his doctor, not submitting the appropriate documentation.").

[8] On June 2, 2018,  Phillips 66's Absence Management Department sent Huerta a letter notifying him his short term disability benefits were terminated as a result of his failure to provide the documentation it had requested, or any documentation whatsoever, by the deadline.  Buentello Dec. at ¶9; E-4.

for King on her office phone, but testified "[he] was not going to call her on her cell phone." *Id.* at 133:13-14. He did not provide the requested documentation. *Id.* at 136:1-4.

- June 4, 2018 – King called Huerta and left a message asking him to return her call, explaining she had been trying to get in contact with him to ask questions about his absence. King Dec. at ¶14; Huerta Dep. at 132:8-11. She again provided her office phone number and cell number. *Id.*

- June 6, 2018 – King called Huerta and left another voicemail asking him to return her call. King Dec. at ¶15.

On June 7, 2018, Huerta called and spoke to King. Huerta Dep. at 139:4-149:9; King Dec. at ¶16. He recorded the call. Huerta Dep. at 139:4-149:9. King explained that the Company had not yet terminated him for job abandonment as she still wanted an opportunity to speak to him to discuss his absence and documentation. *Id.* at 139:4-7, 141:13-25, 143:16-24; King Dep. at 32:25-33:10. She advised Huerta: "I'm not asking you to report to work. I'm just asking you to come in for – for a 30-minute meeting or so. Are you saying that based on your restrictions you can't come in for a meeting?" Huerta Dep. at 144:4-12. Huerta responded:  "No, I'm saying I'm just going to ask my doctor because I'm on approved FMLA." *Id.* Huerta clarified during his deposition that he did not believe he needed to meet with King to answer her questions because his FMLA leave had been approved. *Id.* at 145:4-13.

In response, King attempted to gather information from Huerta about his physical restrictions during the call, explaining "we don't have any details that outline specifically what your restrictions are . . . ." *Id.* at 146:25-147:4. Huerta refused to respond, stating that his physician had already provided this information or he would "send another form." *Id.* at 147:10-12. King and Jermaine Davis, another HR Business Partner who

joined the call as a witness, directed Huerta to meet King at the refinery the next day, June 8th, at 10:00 am, for a meeting. *Id.* at 147:20-149:13. They told Huerta if he declined to attend the meeting, he would be terminated for job abandonment. *Id.*

The following day, twenty minutes before the meeting, Huerta called King and informed her that he would not attend.[9]   *Id.* at 150:25-151:7. As a result, King recommended Phillips 66 terminate Huerta's employment for job abandonment. Huerta Dep at 151:12-19; King Dec. at ¶17; King Dep. at  39:24-40:3; Saiz Dec. at ¶7. Saiz and Phillips 66's Legal and Ethics Departments reviewed and approved the decision. *Id.* Huerta's termination was effective June 8, 2018.[10]  *Id.*; A-7.

## VII.    Huerta Files This Lawsuit

After his termination, Huerta filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on March 27, 2019, complaining for the first time of discrimination by Phillips 66. Huerta Dep. 153:2-10; Exhibit H. After requesting a Notice of Right to Sue, Huerta filed this lawsuit. Notwithstanding that he admitted that he did not provide the information the Company requested multiple times to verify his need for medical leave, Huerta claims that Phillips 66 terminated him because of his age (50), disability (diabetes), and national origin (Mexican-American) and

---

[9] Because medical information submitted by employees is kept strictly confidential by Phillips 66's Absence Management and Medical Services Departments, King and Saiz did not learn that Huerta was diabetic or that he requested FMLA leave related to his diabetes until after his discharge.  King Dep. at 44:17-23, 45:2-6; *see also* King Dec. at ¶17; R. Buentello Dec. at ¶10; Saiz Dec. at ¶8.

[10] The refinery did not replace Huerta after his termination.  Farley Dec. at ¶11.  Rather, his shifts were distributed among the other Operators in Unit 27 with the same job certifications, including Jesse Austin, who is 56, African American, and also diabetic (according to Huerta); Kameron Owens, who is 28 and African American; and Martin Alsmansa, who is 38 and Hispanic.  *Id.*; King Dec. at ¶16; Huerta Dep. at 186:7 ("Yeah, because Jesse is a diabetic also").

retaliated against him for taking FMLA leave. D.E. 1 at ¶¶16-29. His Complaint also asserts vaguely that he was also "harassed" for taking FMLA leave. *See* D.E. 1 at ¶26.

Huerta acknowledges that no one at Phillips 66 made any negative comments about his diabetes, age, or national origin. Huerta Dep. at 161:18-21, 167:16-22, 169:17-170:16, 173:18-20, 185:16-19. Huerta also did not lodge any complaints during his employment. King Dec. at ¶18.

Although Huerta's allegations are imprecise at best, he appears to allege that the following actions were discriminatory and/or retaliatory:

(1) Huerta asserts that approximately five years before his termination, J.D. Wilkerson, former Lead Operator, asked some Operators to take bikes from the refinery's Coker unit and bring them to Unit 27. Huerta Dep. at 156-9-158:8. Wilkerson directed the Operators to take Huerta with them, which Huerta believes implied he knew how to steal bikes. *Id.*

(2) On another occasion several years before his discharge, Huerta claims that Wilkerson also described a piece of refinery equipment as the "slave" and another piece of equipment as the "master," which Huerta believes is discriminatory on the basis of his national origin. *Id.* at 159:90-20.

(3) At some point, Dale Thames, former Lead Operator, asked him to pick up trash in the control room on one occasion. *Id.* at 161:4-164:24.

(4) Even though Huerta did not have all five job line certifications to become a Lead Operator, Huerta complains that Thames also did not prepare a letter of recommendation for him to become a Lead Operator, *Id.*

(5) Huerta claims that Farley ignored him but spoke to other Operators in the control room during his shifts because of his age. *Id.* at 169:17-170:16. Although neither Farley nor anyone else at Phillips 66 ever made comments to him about his age, Huerta believes Farley spoke to everyone in the control room except him because he is older than other Operators. *Id.* at 169:21-170:9, 173:18-20.

(6) Farley gave him a written warning in April 2014 for sleeping while on duty, which he believes was discriminatory on the basis of his disability because his feet were on the desk because they were tingling, but he was not actually asleep. *Id.* at 178:22-183:12

(7) He was discriminated on the basis of his disability because he was denied an accommodation to check his blood sugar levels during his shifts. *Id.* However, Huerta never asked anyone at Phillips 66 for an accommodation to check his sugar levels or to take insulin during his shift. *Id.* at 123:19-124:9, 174:14-175:2.

(8) King subjected him to a hostile work environment on the basis of his FMLA status because she contacted him multiple times for additional information to support his leave. *Id.* at 190:13-21.

(9) Phillips 66 terminated him because of his disability, age, and national origin, and for taking FMLA leave. Compl. at ¶¶16-29.

Phillips 66 denies these allegations in their entirety.

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine dispute as to any material fact exists, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Summary judgment is warranted if Huerta fails to establish the existence of an essential element of his case. *Celotex*, 477 U.S. at 322. Unsubstantiated beliefs and opinions are not competent summary judgment evidence. *VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011).

## ARGUMENTS & AUTHORITIES

I.   **Huerta's Age, National Origin, and Disability Disparate Treatment Discrimination Claims Fail As a Matter of Law**

Summary judgment is appropriate on Huerta's age, national origin, and disability discrimination claims.[11]

---

[11] For purposes of summary judgment only, Phillips 66 does not contest whether Huerta's diabetes constituted a disability under the ADAAA.  The record is unclear as to whether Huerta actually had a

**A.     Huerta's Allegations Related to His Written Warnings are Time Barred**

As a threshold matter, to the extent Huerta asserts separate disparate treatment discrimination claims based on the written warnings he received in April 2016 and March 2018, these claims should be given short shrift.  These claims are time barred under Title VII, the ADEA, and the ADA. Plaintiffs with Title VII, ADEA, and ADA claims must exhaust administrative remedies before pursuing those claims in federal court. *Owens v. Dallas County Cmty. Coll. Dist.,* 793 F. App'x. 298, 300 (5th Cir. 2019) (ADA and Title VII); *Smith v. Potter*, 400 Fed. Appx. 806, 811 (5th Cir. 2010) (ADEA). Any 'bad conduct" that occurred prior to 300 days before a plaintiff's EEOC charge is time barred. *Frank v. Xerox*, 347 F.3d 130, 136 (5th Cir. 2003). Huerta filed his first and only EEOC Charge on March 27, 2019. Accordingly, all acts that occurred before May 31, 2018 – 300 days before March 27, 2019 – are time barred.

**B.     On His Remaining Termination Claim, Huerta Cannot Establish the Fourth Element of His Prima Facie Cases**

1.     <u>Prima Facie Case Standard</u>

Summary judgment is also proper on Huerta's timely termination claim.[12]

---

disability, especially given that he performed his Operator duties for 12 years while treating his diabetes without issue.  Huerta Dep. at 177:22-178:5.

[12] To the extent Huerta seeks to establish a discrimination claim using allegations that his supervisor did not speak to him in the control room, a colleague declined to write a recommendation letter for him, and another operator asked him to pick up trash on one occasion, in addition to being time-barred and not exhausted, these allegations are not actionable adverse employment actions.  *King v. Louisiana*, 294 F. App'x 77, 85-86 (5th Cir. 2008) ("Even taken in a light most favorable to [plaintiff], allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation."); *Hayatdavoudi v. Univ. of La. Sys. Bd. of Trs.*, 240 F.3d 1073, at *6-7 (5th Cir. 2000) (finding no adverse employment action when plaintiff was called a "dog in the desert" and an "idiot").

Because Huerta relies on circumstantial evidence to support his allegations, he has the burden of proving his prima facie cases of discrimination by a preponderance of the evidence. [13] *See McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973). If Huerta succeeds in proving his prima facie cases, the burden of production shifts to Phillips 66 to articulate a legitimate, non-discriminatory reason for its actions. *See id.* Once Phillips 66 proffers its reason, any presumption of discrimination disappears, and Phillips 66 must prove by a preponderance of the evidence that Phillips 66's articulated reason is pretext for discrimination. *Id.*

To establish a prima facie claim of disability discrimination, Huerta must prove that he (1) suffers from a disability; (2) is qualified for the position for which he sought employment or continued employment; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or otherwise treated less favorably than non-disabled employees. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

Similarly, to prove a prima facie case of age and/or national origin discrimination, Huerta must establish that he (1) is a member of a protected class; (2) qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by someone outside his protected class (under 40 or not Mexican-American) or otherwise treated less favorably than younger employees. *Pryor vs. MD Anderson Cancer Ctr.*, 495 F. App'x 544, 546 (5th Cir. 2012); *Jackson v. Cal-W. Packaging Co.*, 602 F.3d 374, 278-80 (5th

---

[13] When plaintiffs rely on circumstantial evidence, courts employ the familiar burden-shifting scheme articulated by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. at 802.

Cir. 2010).

Huerta cannot establish the fourth element of his prima facie cases—that he was replaced by someone outside the protected class or otherwise treated less favorably than similar situated employees outside of his protected classes (under 40, not Mexican-American, or not disabled).

First, Huerta is unable to point to anyone outside of his protected class who replaced him. To be clear, Huerta cannot "establish this element merely by showing that the existing employees to whom his duties were passed are not disabled, [Mexican, or younger]." *Carbaugh v. Unisoft Int'l, Inc.*, No. 10-0670, 2011 WL 5553724, at *9 (S.D. Tex. Nov. 15, 2011); *see also Martin v. Bayland, Inc*., 403 F. Supp. 2d 578, 583 (S.D. Tex. 2005), aff'd, 181 F. App'x 422 (5th Cir. 2006) ("When a terminated employee's job duties are distributed among other employees after termination, those employees do not replace the terminated employee.").

Second, Huerta is unable to show that Phillips 66 gave preferential treatment to similarly situated, non-disabled, non-Mexican-American, or younger employees under nearly identical circumstances. *See Okoye v. Univ. of Tex. Hous. Health Sci. Ctr*., 245 F.3d 507, 514 (5th Cir. 2001); *Williams v. Trader Publ'g Co*., 218 F.3d 481, 484 (5th Cir. 2000). The "nearly identical" standard is stringent. *See Lee v. Kan. City S. Ry. Co*., 574 F.3d 253, 259-60 (5th Cir. 2009). Employees being compared must have the same jobs or responsibilities, share the same supervisor, and have essentially the same comparable violation histories. *Id.* **"And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered**

**comparator who allegedly drew dissimilar employment decisions.**" *Id.* (emphasis added); *Player v. Kan. City S. Ry. Co.,* 496 F. App'x 479, 481-482 (5th Cir. 2012) (emphasis added).

Huerta has failed to identify a single younger, non-disabled, or non-Mexican-American comparator. *Reyna v. Donley*, 479 F. App'x 609, 611-12 (5th Cir. 2012); *Wilson v. City of Baton Rouge*, 327 F. App'x 497, 499 (5th Cir. 2009). Huerta claims only that Patrick Buentello, Shift Leader, was treated more favorably because Buentello did not receive a written warning when he was late for work on one occasion, but Huerta alleges he received a written warning on one occasion when he was only two minutes late for work.[14]  Huerta Dep. at 166:8-19. Buentello, who is over 40 and Hispanic like Huerta, does not meet the "nearly identical" standard because Buentello and Huerta held different positions. Buentello is a Shift Leader, and Huerta was an Operator.

Moreover, Huerta has not pointed to anyone—much less an Operator reporting to Farley—who engaged in conduct outside of work inconsistent with his medical restrictions, then failed to provide information requested by the Company on numerous occasions to support the medical leave of absence, and then failed to report to a meeting with Human Resources to discuss the lack of information and documentation, but whom Phillips 66 did not terminate. *Lee,* 574 F.3d at 259-60 (explaining the most critical part is whether the comparator engaged in similar conduct to the plaintiff's conduct that resulted in the employment decision); *see, e.g.*, *Bouie v. Equistar Chems., LP*, 188 F. App'x 233, 237 (5th Cir. 2006) (affirming that a plaintiff discharged for violating two safety

---

[14] Phillips 66 denies that Huerta received a written warning for tardiness.

protocols could not use comparator who only violated one safety protocol); *Dodge v. Hertz Corp.*, 124 F. App'x 242, 244 (5th Cir. 2005) (explaining that even though plaintiff's and proffered comparator's acts were both "dishonest," this was insufficient to make misconduct nearly identical); *Trotter v. BPB Am., Inc.*, 106 F. App'x 272, 276-77 (5th Cir. 2004) (affirming that misconduct of employees who fought with other employees was not nearly identical to plaintiff, who fought with union president).

Rather, the undisputed evidence shows that Phillips 66 treated Huerta consistently with other Sweeny Refinery Operators who were observed engaging in conduct outside of work inconsistent with their request for a medical leaves of absence and who were unable to provide information to explain the discrepancy. King Dec. at 10. Like Huerta, these employees were terminated. *Id.* Huerta's subjective belief and opinion that non-disabled, non-Mexican-American, or younger employees were treated better is insufficient to defeat summary judgment. *See Burch v. City of Nacogdoches*, 174 F.3d 615, 622 n.11 (5th Cir. 1999) (observing courts should not credit unsupported assertions of discrimination). Accordingly, Huerta's prima facie cases fail and summary judgment is warranted.

**C.    Huerta Has No Evidence of Pretext**

1.    <u>Phillips 66 Terminated Huerta For a Legitimate, Non-Discriminatory Reason</u>

Even assuming Huerta could establish his prima facie cases, Phillips 66 has a legitimate, non-discriminatory reason for Huerta's termination. Because Huerta's supervisor believed Huerta had called in sick under suspicious circumstances, Human

Resources retained an external investigator to determine the legitimacy of Huerta's absence. King Dep. at 56:13-57-1; King Dec. at ¶9; Saiz Dec. at ¶7; Farley Dec. at ¶9. After the investigator confirmed that Huerta was in fact engaged in suspicious activities, the Company tried to contact Huerta for a month by phone and mail (at least nine times) to request documentation and information to determine the legitimacy of his medical leave of absence. *See supra* Section VI.

Because Phillips 66 had a good faith belief that Huerta misused FMLA leave, and Huerta refused to provide the information requested to rebut its good faith belief, and then failed to report to a meeting with Human Resources to discuss their concerns, the Company concluded Huerta had abandoned his position and terminated his employment. King Dec. at ¶14; King Dep. at 39:24-40:3; Saiz Dec. at ¶7; Huerta Dep. at 151:12-19. Failing to report to work and failing to rebut potential dishonesty related to a medical leave of absence are legitimate, non-discriminatory reasons for discharge. *Spindle v. CKJ Trucking, LP*, No. 4:18-CV-818, 2020 WL 1283519, at *5 (E.D. Tex. Mar. 18, 2020) (granting summary judgment on the plaintiff's FMLA retaliation claim when he had voluntarily resigned due to job abandonment after failing to report to work); *Scott v. DMN, Inc.*, No. CIV.A.3:99-CV-2776-L, 2001 WL 428276, at *2 (N.D. Tex. Apr. 19, 2001) ("The court finds as a matter of law that job abandonment is a legitimate nondiscriminatory reason for discharging Scott."); *Mekasha v. ExxonMobil Corp.*, No. 3-04-CV-0797-B, 2005 WL 1215025, at *3 (N.D. Tex. May 20, 2005) (same); *Cook v. E. Tex. State Univ.*, 142 F.3d 1279 (5th Cir. 1998) (finding that defendant had "articulated a legitimate nondiscrimination reason for her termination, job abandonment"). Because

Phillips 66 has met its burden of production, the burden shifts to Huerta to establish pretext.

               2.      <u>Huerta Has No Evidence of Pretext</u>

First, Huerta's belief that it was invasive of Phillips 66 to retain a private investigator to confirm its suspicions of absence fraud or unfair of Phillips 66 to request information to support his leave of absence after its suspicions were confirmed, is not evidence of pretext.   Anti-discrimination laws "do[] not protect against unfair employment decisions; it mandates only that decisions be made without discriminatory animus." *Jones v. Overnite Transp. Co*., 212 F. App'x 268, 275 (5th Cir. 2006); *see also Bryant v. Compass Grp. USA*, 413 F.3d 471, 478 (5th Cir. 2007) ("Management does not have to make proper decisions, only non-discriminatory ones."). It is well established that "it is not the court's place to second-guess management's business decisions or to serve as a self-appointed, corporate personnel manager." *Patton v. United Parcel Serv*., 910 F. Supp. 1250, 1267 (S.D. Tex. 1995). In other words, Huerta's mere disagreement with Phillips 66's business decisions is woefully inadequate.

Huerta cannot dispute that he lacks evidence that a decision maker harbored any discriminatory animus. To support his claims, Huerta points to: (1) one occasion he was asked to pick up trash; (2) the fact that a colleague allegedly declined to write a recommendation letter for a position Huerta was not qualified to hold; (3) a colleague described refinery machinery as "slave" and "master;" (4) Farley did not talk to him in the control room; and (4) on one occasion he was asked to help "steal" bicycles from another Refinery unit.   These allegations simply cannot support a finding of pretext

because they do not evidence discriminatory animus towards Huerta's age, national origin, or disability status. Huerta admits that no Phillips 66 employee made any negative comments about his age, disability-status, or national origin. Huerta Dep. at 161:18-21, 167:16-22, 169:17-170:16, 173:18-20, 185:16-19. Indeed, the various individuals who absorbed Huerta's job duties were within the same protected classes as him: either his age or older, Hispanic, and one allegedly diabetic like him. Farley Dec. at ¶11; King Dec. at ¶16; Huerta Dep. at 186:7.

Moreover, Huerta cannot establish Phillips 66 discriminated against him with respect to his purported disability status because neither King nor Saiz were aware that Huerta was diabetic or that the reason he requested leave was to treat his diabetes when they made the decision to discharge him. *See Montgomery v. Potter*, 2:04CV162-D-A, 2006 WL 559240, at *1 (N.D. Miss. Mar. 6, 2006) (finding no evidence of disability discrimination where defendant was unaware of the plaintiff's alleged physical disabilities); *Matthews v. Trilogy Commc'ns*, 143 F.3d 1160, 1167 (8th Cir. 1998) (holding employee treated for diabetes-related medical expenses and terminated shortly thereafter did not support inference of discriminatory motive when employer did not know the plaintiff had diabetes).

In the end, any argument for pretext is based solely on Huerta's subjective beliefs that Phillips 66's actions were pretext for disability, national origin, or age discrimination. Accordingly, summary judgment is proper. *Hervey v. Miss. Dep't of Educ.,* 404 F. App'x 865, 870 (5th Cir. 2010) (holding an employer's incorrect belief in the underlying facts for the discipline is still a non-discriminatory reason and "subjective

beliefs of discrimination cannot be the basis of judicial relief"); *Schaeffer v. Warren Cnty.*, 2016 WL 411221, at *4 (S.D. Miss. Feb. 2, 2016) ("Generally denying the alleged wrongdoing upon which termination was based is not sufficient to rebut a defendant's reasons for terminating a plaintiff.").

## II.   Huerta's FMLA Claims Fail as a Matter of Law

### A.   Huerta Has No Evidence to Support an FMLA Retaliation Claim

Summary judgment is also proper on Huerta's FMLA retaliation claim for the same reasons his discrimination claims fail.   FMLA retaliation claims are analyzed under the same burden-shifting framework as Huerta's disparate treatment discrimination claims.[15]   *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 766 (5th Cir. 2016) (FMLA).

Huerta offers no evidence from which a jury could infer that Phillips 66's legitimate reason for terminating him was pretext for retaliation. Phillips 66 reasonably suspected that Huerta was misusing his FMLA leave, and "that [Phillips 66] was suspicious or that its suspicions were confirmed does not raise an inference that [it] acted with a retaliatory motive." *Connel v. Hallmark Cards, Inc.*, No. 01-2060, 2002 WL 188467, at *7 (D. Kan. Feb. 1, 2002); *see Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir. 2005) ("Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave ....").

The fact Huerta took FMLA leave does not excuse him from complying with

---

[15] First, Huerta must establish a prima facie case of retaliation by showing: (1) he engaged in an activity protected under the FMLA; (2) he was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.   *Id.*   If successful, the burden of production shifts to Phillips 66 to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Id.  Huerta must then demonstrate that the articulated reason is pretextual. *Id.*

Phillips 66's requirements to provide the documentation necessary to support his leave of absence. *Miedema v. Facility Concession Servs., Inc*., 487 F. App'x. 214, 217 (5th Cir. 2012) (affirming summary judgment for the employer on employee's FMLA claim and noting that an employer is entitled to seek additional information when the information provided by the employee is either incomplete or insufficient); *Palmer v. Sw. Bell Tel., L.P.*, A-06-CA-478-SS, 2007 WL 9701631, at *7 (W.D. Tex. Mar. 15, 2007) ("Even medical excuse notes offering some minimal explanation of the patient's condition and absence are insufficient FMLA certification where they do not offer information legitimately requested by the employer's FMLA medical certification forms.").

Further, as discussed above, Huerta offers no comparator evidence that his case was investigated differently than any other employee's. The fact that Phillips 66 has no standard policy defining when to retain an investigator, but instead uses Human Resources personnel to evaluate suspected abuses of FMLA and other types of leave on a case-by-case basis, does not create an inference of retaliatory motive. *Prichard v. Phillips 66 Motor Mfg. of Alabama, LLC*, 418 F. Supp. 3d 930, 937–38 (M.D. Ala. 2019) (denying FMLA retaliation claim where company retained a private investigator to investigate FMLA leave misuse).

Finally, Huerta cannot establish a retaliatory motive simply because Phillips 66 requested additional supporting documentation to assess the legitimacy of his leave. Nothing prohibits an employer from lawfully investigating employee misconduct. *See generally Total Sys. Servs.*, Inc., 221 F.3d at 1176 (noting that this kind of investigation is part of "conducting the company's own business"). This principle applies equally to

suspected abuse of FMLA leave. *Prichard*, 418 F. Supp. at 937–38 (citing *Andrews v. CSX Transp., Inc.*, No. 3:06-cv-704, 2010 WL 6792993, at *2 (M.D. Fla. Dec. 20, 2010) for the proposition that an employee on leave does not possess greater rights than an employee not on leave). As another district court has noted in reviewing and rejecting a nearly identical FMLA retaliation claim, "an employer is prudent to conduct such an investigation." *Id.*

### B.    FMLA Harassment Is Not a Cause of Action

Although Huerta fails to state the statutory framework under which he asserts a hostile work environment claim, Huerta's Complaint and testimony appear to ground the claim under the FMLA. *See* Complt. at ¶26; Huerta Dep. at 190:12-16 ("Q. Why do you believe Ms. King subjected you to a hostile work environment? A. Because when I was on FMLA, she kept harassing me.").

A claim for hostile work environment, however, does not exist under the FMLA. *See Smith-Schrenk v. Genon Energy Servs., LLC.*, H-13-2902, 2015 WL 150727, at *4 n.60 (S.D. Tex. Jan. 12, 2015) (explaining that federal courts have not recognized a FMLA cause of action based on hostile work environment); *see also Freberg v. Marquette Gen. Health Sys.*, No. 2:13-CV-316, 2014 WL 1028891, at *4 (W.D. Mich. Mar. 17, 2014) ("The Court is unaware of any case holding that a plaintiff may assert a hostile work environment claim under the FMLA."); *Armstrong v. Indiana State Bd. of Accounts*, No. 303-CV174, 2005 WL 2656742, at *4 (S.D. Ind. Oct. 18, 2005) (same).

To the extent that Huerta is asserting a disability-based hostile work environment,

his claim still falls woefully short of the stringent standard to establish such a claim.[16]

Huerta has no evidence of offensive disability-based conduct whatsoever, let alone severe

or pervasive conduct. *Dortch v. Mem'l Herman Healthcare Sys.*, 525 F. Supp. 2d 849,

873 (S.D. Tex. 2007). As a result, to the extent Huerta asserts a hostile work environment

claim, summary judgment is proper.

### III.   Huerta's ADA Failure to Accommodate Claim Fails as a Matter of Law

For the first time in his deposition, Huerta also alleged Phillips 66 failed to

accommodate him because it did not provide him a place to check his insulin levels.[17]

Huerta did not exhaust this claim, nor has he stated a failure to accommodate claim in his

Complaint. *See* Compl. at ¶¶16-29; Ex. H. As a result, any failure to accommodate claim

must be dismissed. *Cook v. Stephen F. Austin Univ.*, 9:19-CV-201-RC-ZJH, 2020 WL

6553963, at *3, n. 4 (E.D. Tex. Oct. 21, 2020) (failure to accommodate claim not plead in

the complaint is barred); *Wellington v. Texas Guaranteed*, 2014 WL 2114832, at *5

(W.D. Tex. May 20, 2014) (dismissing ADA failure to accommodate claim because it

was not raised in the plaintiff's complaint and the narrative of the charge failed to

mention the alleged protected activity or acts cited in the complaint); *Stevenson v. Bost*,

2011 WL 2181735, at *7 (E.D.N.C. June 3, 2011) (holding plaintiff failed to exhaust

---

[16] To establish an ADA hostile work environment claim, a plaintiff must prove that he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his disability or disabilities; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment. *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 234 (5th Cir. 2001). "Moreover, the disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Id.*

[17] A failure to accommodate claim is distinct from a claim of disparate treatment under the ADA. *See Windhauser v. Bd. of Supervisors for La. State Univ.*, 360 F. App'x 562, 565 (5th Cir. 2010).

retaliation claim despite checking the box because the allegations in the charge did "not even vaguely correspond" to the retaliation claims alleged in complaint).

Even if he had properly exhausted or pled a failure to accommodate claim, he has no evidence to support such a claim. To establish a disability accommodation claim, Huerta would need to demonstrate that: (1) he is a qualified individual with a disability; and (2) the employer failed to make reasonable accommodations for such known limitations. *See Molden v. E. Baton Rouge Par. Sch. Bd.*, 715 F. App'x 310, 314-15 (5th Cir. 2017); *Feist v. La. Dep't. of Justice, Office of the Att'y. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)). Here, Huerta shoulders the burden of **<u>requesting</u>** and proving the existence of a reasonable accommodation. *Jenkins*, 487 F.3d at 316; *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 166 (5th Cir. 1996).

Here, Huerta admits he never asked anyone at Phillips 66 for an accommodation to check his sugar levels or to take insulin during his shift, which is fatal to his claim. *Id.* at 123:19-124:9, 174:14-175:2. As the Fifth Circuit recently explained: "[Plaintiff's] failure to request an accommodation means that his failure-to engage-in-the-interactive-process claim is dead on arrival: Without a request, [Defendant] could not possibly fail to engage in an interactive process. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (upholding dismissal of failure to accommodate claim). As a result, any failure to accommodate claim also fails as a matter of law. *Id.*

## CONCLUSION

Based on the facts presented and the relevant authorities, Defendant Phillips 66 Company respectfully requests that the Court grant summary judgment on all of Plaintiff

Joseph Huerta's claims, costs as the prevailing party, and all other relief to which it is

entitled.

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, this pleading was served on opposing counsel on December 14, 2020

Gordon R. Cooper II
Cooper & Cooper
3620 South Macgregor Way
Houston, Texas 77021-1504
Gordon@gordoncooperii.com
Telephone: 713-747-1446


_____/s/ *Heather Sherrod*_____
Heather Sherrod